**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Amanda McBroom,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Ethicon, Inc.; and Johnson & Johnson,<br><br>　　　　　Defendants. | No. CV-20-02127-PHX-DGC<br><br>**ORDER** |

This products liability action involves pelvic mesh devices made by Defendants Ethicon, Inc. and Johnson & Johnson. Plaintiff Amanda McBroom received implants of Defendants' devices in 2007. She claims they are defective and caused her serious injury. Plaintiff filed this suit in 2015 as part of a multidistrict litigation ("MDL") proceeding in West Virginia. Doc. 1; *see In re Ethicon, Inc. Pelvic Repair Sys. Prods. Liab. Litig.*, MDL No. 2327 (S.D. W. Va. 2012). The case was transferred to this Court on November 4, 2020. Docs. 41, 56.

A jury trial on Plaintiff's design-based claims will begin on March 7, 2022. *See* Docs. 144-45. The parties have filed various motions in limine ("MILs"). This order addresses Defendants' MILs 1, 2, 13, 14, and 17, and Plaintiff's MIL 5 (Docs. 164, 175, 178, 189, 190, 193), which were addressed at the final pretrial conference on February 25. *See* Doc. 274.[1]

---

[1] The Court ruled on the other MILs in separate orders. *See* Docs. 231-37, 239-55.

**I.      Background.**

Defendants design and manufacture polypropylene-based pelvic mesh devices to treat female stress urinary incontinence and pelvic organ prolapse. Pelvic mesh products and other medical devices must be approved or cleared for market by the Food and Drug Administration ("FDA"). The FDA may approve a medical device that is shown to be safe and effective through a process known as "premarket approval." 21 U.S.C. § 360e(a). In addition, through a less rigorous process known as "§ 510(k)" review, a manufacturer can obtain "clearance" to market a device by showing that it is substantially equivalent to a device already on the market. 21 U.S.C. § 360c(f)(1)(A).

On April 6, 2007, Plaintiff was implanted with two of Defendants' pelvic mesh devices – the Gynecare TVT Secur System ("TVT Secur") and the Gynecare Prolift Pelvic Floor Repair System ("Prolift"). Docs. 1 ¶¶ 8-10, 30-1 at 3. Each device received § 510(k) clearance from the FDA – the TVT-Secur on November 28, 2005, and the Prolift on May 15, 2008. *See* Doc. 164 at 2.

Plaintiff claims that she began experiencing adverse symptoms from the products in 2011. Doc. 30-1 at 4. She had surgery in July 2014 to remove an exposed portion of the Prolift mesh. Doc. 32-3 ¶ 39. Plaintiff asserts various claims and seeks compensatory and punitive damages. Doc. 1; *see McBroom v. Ethicon, Inc.*, No. 2:15-cv-03043 (S.D. W. Va. Mar. 13, 2015). The parties agree that Arizona law governs this case. Doc. 177-1 at 5.

In March 2021, the Court granted Defendants' motion for partial summary judgment in part. Docs. 30, 83. The following claims remain: strict liability design defect (Count V), negligent design (Count I), negligent infliction of emotional distress based on product design (Count IX), and punitive damages (Count XVII). *See* Docs. 1 at 4-5, 83 at 10-11.

**II.     Defendants' MIL 1 to Exclude Evidence Related to Punitive Damages.**

In 2012, the Arizona Legislature enacted A.R.S. § 12-689, which exempts product manufacturers and sellers from liability for punitive damages in certain situations. Under § 12-689(A)(1), a manufacturer or seller is not liable for punitive damages if:

> [T]he product alleged to have caused the harm was designed, manufactured, packaged, labeled, sold or represented in relevant and material respects according to the terms of an approval, conditional approval, clearance, license or similar determination of a government agency.

A.R.S. § 12-689(A)(1); *see* Ariz. S. Fact Sheet, 2012 Reg. Sess. H.B. 2503 (Apr. 5, 2012) (explaining that the purpose of § 12-689 is to "[e]xempt[] a manufacturer from liability for punitive damages if the manufacturer follows federal, state or agency-issued product standards"); *Baca v. Johnson & Johnson*, No. CV-20-01036-PHX-DJH, 2020 WL 6450294, at *6 (D. Ariz. Nov. 2, 2020) (§ 12-689(A)(1) shields manufacturers and sellers from liability for punitive damages "if the product was approved by a government agency").

Defendants argue that § 12-689(A)(1) bars punitive damages because the remaining claims in this case focus on the design of the TVT Secur and Prolift devices, and the designs of both products were cleared by the FDA in § 510(k) clearances. Docs. 164 at 1-3, 238 at 1-2. Plaintiff contends that § 12-689 cannot be applied in this case because her right to seek punitive damages vested before the August 2012 effective date of the statute and cannot be eliminated retroactively. Doc. 208 at 3. She also contends that the statute does not bar punitive damages based on the Prolift device because it was sold and implanted in her before it received FDA clearance. Doc. 208 at 2. She concedes that TVT Secur was cleared by the FDA before she received it. For reasons stated below, the Court finds that punitive damages are not available to Plaintiff under Arizona law.

**A.   Plaintiff's Right to Punitive Damages Did Not Vest in 2012.**

Section 12-689 went into effect on August 2, 2012. *See* Arizona Legislature, *General Effective Dates*, https://www.azleg.gov/general-effective-dates (last visited Feb. 22, 2022). Plaintiff filed this lawsuit more than two years later in March 2015. Doc. 1. Plaintiff contends, nonetheless, that application of the statute to her case would constitute a retroactive and unlawful deprivation of her right to punitive damages because she was injured, and her right to seek punitive damages vested, no later than April 2012 – before the statute's August 2012 effective date. Doc. 208 at 3. To support this contention,

Plaintiff relies heavily on the Arizona Supreme Court decision in *Hall v. A.N.R. Freight Sys., Inc.*, 717 P.2d 434, 444 (Ariz. 1986), and its statement in one sentence that "a right vests only when it is actually *assertable* as a legal cause of action or defense." *Id.* at 444 (emphasis added). Plaintiff argues that her right to punitive damages became "assertable" when she was injured in April 2012 and therefore vested before § 12-689 became law.[2]

Defendants read *Hall* differently, noting that it specifically states that "rights do not vest until the commencement of legal proceedings[.]" *Id*. Defendants argue that Plaintiff's right to punitive damages did not vest until she filed this lawsuit in 2015, and the right was not vested – and therefore was not retroactively eliminated – when § 12-689 became law in August 2012.

During the final pretrial conference, Plaintiff's counsel sought to explain why the Court should rely on *Hall*'s single statement that a right vests when it becomes "assertable" and disregard *Hall*'s statement that rights vest on filing. Counsel noted that *Hall* concerned the vesting of a defense, not the vesting of a plaintiff's claim, and, because a defense cannot be asserted before a case is filed, the right at issue in *Hall* was not "assertable" until the lawsuit was filed, leading to the language stating that the right vested on filing.[3]

The Court is not persuaded by Plaintiff's argument. Although it is true that *Hall* concerned the vesting of a defense, the Court cannot read *Hall* as holding that the affirmative claims of plaintiffs vest before the filing of a lawsuit. True, *Hall* did say in one sentence that rights vest when they become "assertable." But the remaining language of *Hall* makes clear that rights vest when they are actually asserted in a lawsuit. *Hall*

---

[2] During an earlier trial on the statute of limitations defense in this case, Plaintiff persuaded a jury that her claim did not accrue until after March 13, 2013 – well after § 12-689 became effective. *See* Docs. 139 at 2, 150. To explain this possible incongruity, Plaintiff now contends that although her claim did not "accrue" until 2013 for statute of limitations purposes, it became "assertable" for retroactivity purposes when she was injured in 2012. Plaintiff does not explain how one can assert a claim that has not accrued.

[3] Plaintiff also argued during the final pretrial conference that § 12-689(A)(1) created a right to an affirmative defense in Defendants, not a right in Plaintiff. But the right affected by the statute is Plaintiff's right to seek punitive damages. In any event, if Plaintiff is correct that the right at issue belongs to Defendants, then she has no retroactivity argument – she cannot complain that the law retroactively eliminated her right.

- 4 -

specifically stated that "rights do not vest until the commencement of legal proceedings[,]" and that this notion "is not new to our jurisprudence." 717 P.2d at 444. Other statements in *Hall* make the same point. *See id.* at 445 ("This Court, like the Court of Appeals, has consistently defined statutory changes as retroactive only when they affect cases already in litigation."); *id.* at 446 (citing cases "for the proposition that substantive rights vest upon filing, at which point they are no longer contingent"); *id.* at 447 (acknowledging that similarly situated parties may suffer differing consequences depending upon "the fortuity of their filing date").[4]

But the Court need not make this decision by weighing the competing dicta in *Hall*. The question has been decided directly by the Arizona Court of Appeals. In *Brunet v. Murphy*, 135 P.3d 714 (Ariz. Ct. App. 2006), the court specifically addressed when a right to assert a claim vests. The plaintiff in *Brunet* was the estate of the decedent which brought a claim against a doctor under Arizona's Adult Protective Services Act ("APSA"). The trial court granted summary judgment for the doctor because the APSA had been amended to exclude doctors from liability. The Court of Appeals addressed two questions, whether the APSA amendment applied retroactively to the estate's claim and whether application of the amendment was barred by A.R.S. § 1-249. *Id.* at 717-19.[5]

The Court of Appeals held that the trial court did not apply the APSA amendment retroactively to the estate's claim because that claim had not vested when the ASPA was amended – the claim did not vest until it was asserted against the doctor in court. *Id.* at

---

[4] *Hall* also noted that Arizona courts have defined statutory changes as retroactive only when they affect "cases already in litigation." 717 P.2d at 444-45 (citing *Allen v. Fisher*, 574 P.2d 1314, 1315 (Ariz. Ct. App. 1977) (answering "in the negative" the question whether statutes affecting medical malpractice claims can be applied "to an action pending at the time the statutes became effective"); *Gulf Homes, Inc. v. Gonzales*, 676 P.2d 635, 639 (Ariz. Ct. App. 1983) (holding that a 1980 amendment to the Retail Sales Act could not apply to a lawsuit filed in 1976 because a statutory change is not applied retroactively to "proceedings already pending"); *Bouldin v. Turek*, 607 P.2d 954, 955 (Ariz. 1979) (the attorney's fees statute does not apply to "suits commenced before its effective date"); *Abrams v. Horizon Corp.*, 669 P.2d 51, 55 (Ariz. 1983) (statutory amendments limiting the recovery of treble damages in wage dispute actions did not apply to a lawsuit filed two months before the amendments).

[5] The second issue is not relevant to this case and will not be discussed further. No party has claimed that A.R.S. § 1-249 applies here.

- 5 -

718.  *Brunet* explained that *Hall* "drew an explicit distinction between when a right accrues and when it vests[,]" and that "[a] right, even though accrued, does not vest until 'the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest.'"  135 P.3d at 717-18 (quoting *Hall*, 717 P.2d at 444).  "Thus, until the holder of the accrued right *chooses to assert it*, the right is subject to an 'event that may prevent its vesting,' such as the running of the statute of limitations or a change in the law by the legislature." *Id.* at 718 (quoting *Steinfeld v. Nielsen*, 139 P. 879, 896 (Ariz. 1913)) (emphasis added).  *Brunet* thus held that "the estate did not gain 'an immediate fixed right' to assert its claim against [the doctor] *until the estate filed that claim*.  Because the estate *filed no such claim* until after the statutory amendment eliminating the claim became effective, the amendment abrogated the claim before the estate had any vested right to it." *Id.* (emphasis added).

Thus, under Arizona law, Plaintiff's right to punitive damages did not vest until she filed suit in March 2015, more than two years after § 12-689 went into effect.  As a result, if the statute applies to her claim, the claim was eliminated before it vested.  Other cases applying Arizona law have reached the same conclusion. *See Newman v. Select Specialty Hospital-Arizona, Inc.*, 374 P.3d 433, 438-39 (Ariz. Ct. App. 2016) ("Applying the Supreme Court's reasoning in *Hall*, this court in *Brunet* . . . held that a claimant's rights under APSA vest at the time an APSA claim is filed.") (cleaned up); *McMahill v. C R Bard Inc*, No. CV 2017-000927, 2019 WL 4899720, at *4 (Ariz. Super. Ct. July 23, 2019) ("Plaintiff's rights did not vest until he filed for litigation.  [Section 12-689] was effective for years before plaintiff filed for litigation."); *Haddon v. C R Bard Inc.*, No. 3:19-CV-01454-MO, 2021 WL 3131670, at *1 (D. Or. July 23, 2021) ("Under Arizona law, the operative date for a retroactivity analysis is the date the lawsuit was filed. . . . Arizona courts have 'consistently defined statutory changes as retroactive only when they affect cases already in litigation.'"); *Ocasio v. C.R. Bard, Inc.*, No. 8:13-CV-1962-T-36AEP, 2020 WL 3288026, at *2 n.1 (M.D. Fla June 18, 2020) ("*McMahill* . . . rejected an argument that [§ 12-689] did not apply when a device was implanted before the statute was enacted.

- 6 -

The Court explained that the 'plaintiff's rights did not vest until he filed for litigation.' Here, the Complaint was filed on July 29, 2013, approximately one year after the statute was enacted.") (citations omitted).[6]

### B.      Section 12-689(A)(1) Bars Prolift Punitive Damages.

Plaintiff argues that her Prolift device is not covered by the statute because it was implanted in her before it received § 501(k) clearance by the FDA. Prolift initially was marketed by Defendants as a line extension of Gynemesh PS, a pelvic mesh product cleared by the FDA in 2002. *See* Doc. 164-2 ¶¶ 34-35. On this basis it was implanted in Plaintiff in 2007. As a result of inquiries by the FDA about Prolift+M, a product for which Prolift was a predicate, Plaintiff eventually submitted § 501(k) applications for Prolift and Prolift+M. *Id.* ¶¶ 36-54. The FDA cleared both products on May 15, 2008. *Id.* ¶ 55.

Defendants acknowledge that Prolift received FDA clearance after it was implanted in Plaintiff, but argue that the clearance nonetheless means that punitive damages are not available for Prolift's allegedly defective design under § 12-689(A)(1). The Court agrees for three reasons.

First, this is a design defect case and § 12-689(A)(1) expressly covers product design. It bars punitive damages when "the product alleged to have caused the harm was *designed* . . . according to the terms of an approval, conditional approval, clearance, license or similar determination of a government agency." A.R.S. § 12-689(A)(1) (emphasis added). As a matter of course, however, products must be designed before they are cleared by the FDA. Indeed, FDA regulations require that a § 510(k) application include "an explanation of how the device functions, the scientific concepts that form the basis for the

---

[6] Plaintiff cites *Bailey v. Ethicon Inc.*, No. CV-20-00457-TUC-JAS (LCK), 2021 WL 4844393, at *11 (D. Ariz. July 13, 2021), which held that a plaintiff's right to punitive damages vests no later than the date her claim accrues. *Id.* But *Bailey*, like Plaintiff, relied on the single sentence in *Hall* that a right vests "when it is actually *assertable* as a legal cause of action or defense." 2021 WL 4844393, at *11 (quoting *Hall*, 717 P.2d at 444) (emphasis added). The cases cited above, particularly *Brunet*, persuade the Court that this sentence does not reflect the controlling law of Arizona. What is more, *Bailey* held that the plaintiff's right to seek punitive damages "vested at the time [her action] *accrued*[.]" 2021 WL 4844393, at *11 (emphasis added). As already noted, a jury found that Plaintiff's claims accrued after March 13, 2013, well after § 12-689 went into effect. *See* Doc. 139.

device, and the significant physical and performance characteristics of the device, such as *device design*, material used, and physical properties[.]"   21 C.F.R. § 807.92(a)(4) (emphasis added).  By expressly including product design in § 12-689(A)(1), the Arizona legislature clearly protected a pre-clearance activity from punitive damages, provided the design ultimately is cleared by a government agency.

Second, there is no timing requirement in subsection 12-689(A)(1), while other subsections of the statute do include temporal limitations.  Subsection (A)(2), for example, requires that products comply with all statutes, rules, regulations, or orders of a government agency "at the time the product left the control of the manufacturer or seller."  A.R.S. § 12-689(A)(2).  Subsection (B)(1) applies where the manufacture or seller sold the product "after the effective date of a final order of a government agency to remove the product from the market [or] to withdraw its approval of the product[.]"  A.R.S. § 12-689(B)(1).  Clearly, when the Arizona Legislature intended to impose a timing requirement in § 12-689, it knew how to do so.

Third, punitive damages in Arizona are reserved for "'the most egregious of cases,' in which the defendant's 'reprehensible conduct' and 'evil mind' are proven by clear and convincing evidence."  *SWC Baseline & Crismon Investors, L.L.C. v. Augusta Ranch Ltd. P'ship*, 228 Ariz. 271, 289 (Ariz. Ct. App. 2011) (quoting *Sec. Title Agency, Inc. v. Pope*, 219 Ariz. 480, 498 (App. 2008)).  By enacting § 12-689(A)(1), the Arizona legislature made a policy decision that manufacturers who receive FDA clearance for their products do not engage in the kind of egregious conduct for which punitive damages are reserved. As other courts have noted, "Arizona made clear that a manufacturer's conduct does not rise to this level of egregiousness when the product alleged to have caused harm was approved by a government agency."  *Craten v. Foster Poultry Farms Inc.*, No. CV-15-02587-PHX-DLR, 2018 WL 834937, at *4 (D. Ariz. Feb. 13, 2018); *see also Hale*, 2020 WL 1911214, at *3 ("It was the Arizona Legislature's determination [that] punitive damages are an excessive penalty when assessed against a manufacturer of a product that adheres to government specifications."); *Craten*, 2018 WL 834937, at *4 ("[A] jury cannot

as a matter of law find that Foster Farms acted so reprehensibly that punitive damages are warranted when the government agency responsible for regulating the safety of its products allowed them to be sold to the public."). Defendants' Prolift device received FDA § 510(k) clearance. True, the clearance occurred after the device was implanted in Plaintiff, but Plaintiff does not allege that it underwent any meaningful design changes before the FDA cleared it. The very design cleared by the FDA is the design Plaintiff received.[7]

During the final pretrial conference, Plaintiff argued that Defendants lost the right to invoke § 12-689(A)(1) when they stopped selling Prolift in September 2012 after the FDA issued a 522 Order requiring them to conduct further randomized trials of the product. But the Arizona Legislature specified when a change in agency position will eliminate the protection of § 12-689:

> This section does not apply if the claimant establishes that the manufacturer, service provider or seller, at any time before the activity or event that allegedly caused the harm, . . . [s]old the product, activity or service after the effective date of a final order of a government agency to remove the product from the market, to withdraw its approval of the product, activity or service or to substantially alter its terms of approval of the product, activity or service in a manner that would have avoided the claimant's alleged injury.

A.R.S. § 12-689(B)(1). Plaintiff does not claim that the FDA ever issued a final order to remove Prolift from the market, to withdraw its approval of Prolift, or to substantially alter its terms of approval for Prolift.[8]

Plaintiff also argued at the final pretrial conference that Prolift was not a "product"

---

[7] Plaintiff cites *Engleka v. Boston Scientific Corp.*, No. CV-20-00925-PHX-DLR, 2021 WL 4803562 (D. Ariz. Oct. 14, 2021), for the proposition that whether § 12-689(A)(1) applies "turns first on whether the product was marketed according to a clearance at the time it was implanted." Doc. 208 at 2 & n.2. But the products in *Engleka* were cleared before they were implanted. The district court had no occasion to consider whether § 12-689(A)(1) applies where the clearance occurs after implant. *Id.* at *1.

[8] At the Court's direction, Plaintiff's counsel submitted to the Court by email four documents relating to the 522 Order and Defendants' decision to discontinue the sale of Prolift rather than conduct the study required by the order. None of these documents shows that the FDA issued a final order to remove Prolift from the market, to withdraw its approval of Prolift, or to substantially alter its terms of approval for Prolift as required by § 12-689(B)(1). Plaintiff's counsel are directed to file these four documents in the docket.

- 9 -

within the meaning of the statute once it was withdrawn from the market and Defendants therefore cannot invoke the statute. But the statute expressly defines "product" and does not include a requirement that the product be currently on the market. *See* A.R.S. § 12-689(D)(4) ("'Product' means any object possessing intrinsic value, capable of delivery either as an assembled whole or as a component part or parts and produced for introduction into trade or commerce.").

In summary, the Court concludes that § 12-689(A)(1) applies to the Prolift device cleared by the FDA, even though the clearance occurred after the product was implanted in Plaintiff. Plaintiff acknowledges that the TVT-Secur device was cleared by the FDA before her implant. The Court will grant Defendants' MIL 1 and preclude Plaintiff from presenting evidence and argument on punitive damages.[9]

## III.   Defendants' MIL 2 Regarding Pre-Clearance Marketing of Prolift.

As noted above, Ethicon marketed the Prolift as a line extension of its Gynemesh PS device before receiving a separate § 510(k) clearance for Prolift. Doc. 178 at 1. The parties have agreed to accept the MDL Court's ruling excluding evidence related to the FDA's § 510(k) clearance of the Prolift and TVT-Secur and Ethicon's compliance with FDA regulations. *See* Docs. 177-1 at 8. Defendants move to exclude evidence that Ethicon marketed the Prolift before receiving § 510(k) clearance for the device. *Id.* at 1-2.

---

[9] The Court initially denied MIL 1 because it was tantamount to a motion for summary judgment and the time for filing such motions had passed. Doc. 231. The Court stated that Defendants could assert their § 12-689(A)(1) argument in a Rule 50 motion at the close of Plaintiff's case during trial. *Id.* The Court reversed this decision after it realized that the presence or absence of punitive damages evidence could significantly affect the evidence presented during trial, and that some punitive damages evidence could be unfairly prejudicial to Defendants if punitive damages were not at stake. Doc. 256. The Court accordingly directed the parties to present further arguments on the punitive damages issue during the final pretrial conference, which they did at some length. Plaintiff's counsel noted that the briefing on this issue would have been more substantial if it had been raised in a summary judgment motion, which is true, but parties are not required to file summary judgment motions on all legal issues. Such issues can be reserved for mid-trial Rule 50 motions, where the space for briefing and argument likely would be substantially less than the time the Court and parties have devoted to this issue. In any event, Plaintiff's counsel acknowledged that the Court has "everything it needs" to rule on the arguments presented. *See* Court's Livenote Transcript, 2/25/22, at 46. The Court finds that the parties have not been prejudiced by the Court's resolving this issue on a motion in limine.

Plaintiff makes clear that she "does not intend to introduce evidence related to FDA § 510(k) clearance, except as that evidence may bear on punitive damages." Doc. 214 at 1; *see id.* at 2 ("*Nothing* relating to what the FDA did or did not require is relevant to Plaintiff's case other than punitive damages.") (emphasis in original). Because punitive damages are barred by § 12-689(A)(1), the Court will grant Defendants' MIL 2.

Plaintiff assumes that Defendants will not assert at trial that they marketed the Prolift before May 15, 2008 with § 510(K) clearance. *Id.* at 2. Plaintiff contends that if Defendants "open the door" on this issue, she should be allowed to present evidence of pre-clearance marketing history because "Ethicon does not get to pick which half of the FDA story to tell." *Id.* at 2-3. If Plaintiff believes evidence covered by this MIL becomes relevant, she may raise the issue with the Court outside the hearing of the jury.

### IV.    FDA Order and Defendants' Decommercialization of Prolift.

As mentioned above, in January 2012 the FDA issued a 522 Order directing Ethicon to conduct post-market clinical studies and answer questions about the safety of the Prolift device. Doc. 175 at 2. Ethicon stopped selling Prolift and TVT-Secur in August 2012. *See* Doc. 190-1.

Defendants' MIL 13 argues that the 522 Order and similar FDA letters are unfairly prejudicial because they do not represent final agency action and their "official imprimatur" carries a risk of misleading the jury. Doc. 189 at 2. Defendants' MIL 14 argues that Plaintiff should not be permitted to mischaracterize Ethicon's decision to stop selling Prolift and TVT-Secur as a "recall" because the decision was not mandated by the FDA. Doc. 190 at 1. Defendants further contend that evidence of Prolift's removal from the market would be unfairly prejudicial and should be excluded under Rule 407 to the extent Plaintiff offers the evidence to show that Ethicon should have removed the devices from the market before her implant surgery in 2007. *Id.* at 2-3 (citations omitted); *see also* Doc. 206 at 1-2.

Plaintiff states that she has no present intention of introducing the 522 Order into evidence. Doc. 211 at 2. But her MIL 5 seeks to admit evidence that Defendants removed

Prolift from the market, without arguing or implying that the FDA recalled Prolift. Docs. 175 at 1, 212 at 1.  Plaintiff asserts that she should be able to inform the jury that Defendant stopped selling these devices in August 2012 for reasons described in the letter Ethicon sent to physicians and the public.  *Id.*; *see* Doc. 264-1.  The withdrawal is highly relevant, she contends, because it shows that existing studies on Prolift were inadequate to establish the safety of the device.  Doc. 175 at 2.  Plaintiff anticipates that Defendants will seek to introduce evidence that Prolift and TVT-Secur were safe for their intended uses, were not unreasonably dangerous, had low complication rates, were extensively studied prior to market launch, and were implanted successfully in thousands of women.  Doc. 212 at 2.  Plaintiff contends that in fairness she should be permitted to rebut this testimony with evidence that Defendants stopped selling Prolift rather than perform a random controlled trial.  *Id.*[10]

The removal of Prolift from the market is directly linked to the FDA's conclusion that existing studies were not sufficient and that further clinical studies were needed.  It also appears that Defendants' decision to stop selling Prolift and TVT-Secur was related to lawsuits that had been filed and the competitiveness and profitability of the products.  The parties have agreed not to present any FDA-related evidence, and evidence of removal of the product from the market might be incomplete and confusing without it.  And yet if evidence of the 522 Order is admitted, Defendants have stated that they will seek to present evidence that their products received § 510(k) approvals that were never withdrawn, which likely would lead Plaintiff to want to present evidence as to why the § 510(k) approval was not received until after Plaintiff received her product.  It's a slippery slope.

On the other hand, if Defendants intend to use various studies to suggest that their products were safe, it seems unfair to exclude evidence that the FDA thought the studies were insufficient and Defendants removed their products from the market rather than

---

[10] Plaintiff notes that the Court "may instruct the jury that evidence regarding decommercialization of Prolift should not be considered an admission of liability or proof of culpable conduct or a defect in the device or its warnings."  Doc. 175 at 2.  But Plaintiff does not explain why this evidence otherwise would be relevant, and the proposed instruction likely would confuse the jury.

conduct further studies. *See Kieffaber v. Ethicon*, CV 20-1177-KHV (D. Kan. Mar. 25, 2021) ("Defendants will open the door to evidence of the 'decommercialization,' however, if they take the position that [the product] was not unreasonably dangerous, had a low complication rate, was well studied prior to market launch, was successfully implanted in thousands of women, etc.  Under those circumstances it would be fair to ask – if [the product] was such a great product – why Ethicon decided to withdraw it from the market.  If the answer to that impeachment is prejudicial, it is not unfairly so.").

This is a difficult issue, and the Court concludes that it will be better equipped to strike a fair balance during trial.  As a result, the Court will preclude Plaintiff from mentioning the decommercialization of Prolift and the 522 Order until after Defendants have presented their defense.  At that point the Court will have a much better sense as to how much of this evidence should be allowed in.  The Court will then determine what evidence of decommercialization and related FDA actions can be presented during Plaintiff's rebuttal case.  If a point comes earlier in the trial where the parties believe this issue has sufficiently crystalized for the Court to rule, they may raise it outside the hearing of the jury.

V.   **Defendants' MIL 17 Regarding Medical Device Reports.**

Defendants argue, correctly, that medical device reports ("MDRs") made by "device user" facilities, such as hospitals and physicians who are not required to report, are not admissible under 21 U.S.C. § 360i(b)(3).  Doc. 193 at 2 (citing cases).  Plaintiff does not respond to this argument. *See* Doc. 216.  The Court will grant the MIL in this respect. *See Herrera-Nevarez by Springer v. Ethicon, Inc.*, No. 12 C 2404, 2017 WL 3381718, at *5 (N.D. Ill. Aug. 6, 2017) ("The Court bars introduction of 'medical device reports' whose admission is barred by 21 U.S.C. § 360i(b)(3), specifically, those made by hospitals and by physicians who are not required to report.  The cited statute says that such reports may not be introduced in evidence."); *Heinrich v. Ethicon, Inc.*, No. 2:20-cv-00166-APG-VCF, 2021 WL 5056266, at *1 (D. Nev. Nov. 1, 2021) ("The plaintiffs have not responded to the defendants' argument that any MDR reports made by device user facilities are

statutorily excluded from evidence. I therefore grant this portion of the defendants' motion[.]").

Defendants further argue that MDRs are inadmissible "hearsay within hearsay" because they contain the out-of-court statements of the reporting physicians, patients, and other third parties, and that each level of hearsay requires a separate basis for admission into evidence. Doc. 193 at 2 (citing Fed. R. Evid. 805). Plaintiff asserts generally that "courts have previously addressed and rejected similar claims that MDRs are inadmissible hearsay." Doc. 216 at 3 (citing *Chism v. Ethicon Endo-Surgery, Inc.*, No. 4:08CV00341-WRW, 2009 U.S. Dist. LEXIS 94141 (E.D. Ark. Sep. 23, 2009); *Herrera-Nevarez*, 2017 WL 3381718, at *5). But *Chism* held only that, "[t]o the extent that the comments in any reports are comments made by Defendant, they are not hearsay." 2009 U.S. Dist. LEXIS 94141, at *4. And *Herrera-Nevarez* merely noted that certain MDRs "are admissible to show notice (a non-hearsay use)." 2017 WL 3381718, at *5.

"While MDRs may be used to establish notice or knowledge or to suggest alternative causes, *see Berman v. Stryker Corp.*, No. 11 C 1309, 2013 WL 5348324, at *4 (N.D. Ill. Sept. 24, 2013) (collecting cases), they generally are not admissible as conclusive evidence of a product defect, *see id.*; *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL 495607, at *5-6 (D. Ariz. Jan. 22, 2018), or as independent evidence of causation, *see McClain v. Metabolife, Int'l, Inc.*, 401 F.3d 1233, 1250 (11th Cir. 2005)." *In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Prods. Liab. Litig.*, No. 1:17-CV-00944, 2021 WL 2407566, at *2 (D. Md. June 11, 2021). Plaintiff notes that MDRs can show "a defendant's notice or knowledge of a particular defect or danger" (Doc. 216 at 1), but does not explain why such notice is relevant in this design defect case, particularly if punitive damages are not recoverable.

Moreover, neither party has identified which MDRs may be offered at trial, or for what specific purpose. Thus, with the exception of MDRs precluded under 21 U.S.C. § 360i(b)(3), the Court will deny the MIL and rule on the admissibility of any other MDRs during trial. *See In re Smith & Nephew*, 2021 WL 2407566, at *2 ("[T]he parties have not

indicated which MDRs may be proffered, nor for what purpose. Accordingly, the court will not order any blanket exclusion of MDRs at this time. If evidence of MDRs is sought to be introduced at trial, the court may admit them subject to the preceding parameters."); *Heinrich*, 2021 WL 5056266, at *2 ("The defendants do not provide any reports they seek to exclude. Nor do they identify what evidence they are referring to when they mention other anecdotal case reports. The plaintiffs similarly do not provide any reports they may seek to use at trial . . . . The parties therefore have left me unable to rule except to state as a general matter that reports to the FDA are inadmissible hearsay unless the party offering the reports can demonstrate they fall within an exception to the hearsay rule or are being offered for a non-hearsay purpose.").

Finally, Plaintiff notes that "Defendants have not identified an alternative source of data that would have been more accurate than the evidence they seek to exclude." Doc. 216 at 3. But "the fact that this is the only available evidence does not mean that . . . it must be admitted; unreliable evidence should not be admitted solely because other evidence cannot be obtained." *In re Bard IVC Filters*, 2018 WL 495607, at *5.

**IT IS ORDERED:**

1. Defendants' MIL 1 to exclude evidence related to punitive damages (Doc. 164) is **granted**. The Court's order issued February 12, 2022 (Doc. 231) is vacated.

2. Defendants' MIL 2 to exclude evidence of the pre-clearance marketing of Prolift (Doc. 178) is **granted**.

3. Defendants' MIL 13 to exclude evidence of the FDA's 522 Order and related letters (Doc. 189), Defendants' MIL 14 to exclude product decommercialization (Doc. 190), and Plaintiff's MIL 5 to admit evidence decommercialization (Doc. 175) are **granted in part and denied in part** as set forth above.

4. Defendants' MIL 17 Regarding Medical Device Reports (Doc. 193) is **granted in part and denied in part** as set forth above.

Dated this 1st day of March, 2022.

David G. Campbell
Senior United States District Judge